AO106 (Rev. 12/03)  Affidavit for Search Warrant

# UNITED STATES DISTRICT COURT

_____ DISTRICT OF _____

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

███████████

Dover, Delaware

**REDACTED**

I, Jeffrey Dunn _____

I am a(n) Special Agent, DEA _____
Official Title

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

Case Number: 06- 54 M - M P T

_____ being duly sworn depose and say:

_____ and have reason to believe

that ☐ on the person of or  ☑ on the property or premises known as (name, description and/or location)

███████████ Dover, Delaware

in the _____ District of  Delaware _____

there is now concealed a certain person or property, namely (describe the person or property to be seized)

See Attachment A

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

evidence, fruits and/or instrumentalities of a crime

concerning a violation of Title  21 _____ United States code, Section(s)  841, 843, 846, 856

The facts to support a finding of probable cause are as follows:

FILED

AUG 31 20

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

Continued on the attached sheet and made a part hereof:  ☑ Yes  ☐ No

Signature of Affiant

Sworn to before me and subscribed in my presence,

April 26, 2006
Date

at  Wilmington, Delaware
City                                    State

Hon. Mary Pat Thynge          U.S. Magistrate Judge
Name of Judge                      Title of Judge

Signature of Judge

ATTACHMENT A

a)    Books, records, receipts, notes, ledgers, and other papers relating to the transportation, ordering, purchase and distribution of controlled substances, in particular cocaine and crack cocaine.

b)    Books, records, invoices, receipts, bank statements and related records, passbooks, money drafts, money orders, bank drafts, cashiers checks, bank checks, safe deposit box keys and related records, money wrappers, and other items evidencing the obtaining secreting, transfer, and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money.

c)    United States currency (in excess of $1000.00), and jewelry, in amounts indicative of the proceeds of illegal drug trafficking.

d)    Photographs, including still photos, video tapes, films, and the contents therein, slides, in particular photographs of co conspirators, of assets and/or controlled substances.

e)    Address and/or telephone books, and any papers reflecting names, addresses, telephone numbers, pager numbers, and fax numbers of co conspirators, sources of supply, and customers.

f)    Firearms and ammunition.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

Special Agent Jeffrey Dunn, of the U.S. Drug Enforcement Administration, being duly sworn, deposes and states the following:

1.      I am a Special Agent with the United States Drug Enforcement Administration (hereinafter "DEA"). I have been a Special Agent with DEA for approximately nine years, currently assigned to the Dover, Delaware, Resident Office. Among other duties, I am now responsible for the instant investigation.

2.      During my nearly nine years with the DEA, I have participated in numerous narcotic and money laundering investigations during the course of which I have conducted physical and wire surveillance, executions of search warrants, reviews and analyses of taped conversations and records of drug traffickers. Therefore, I am familiar with the manner in which illegal drugs are imported and distributed, the method of payment for such drugs, and the efforts of persons involved in such activity to avoid detection by law enforcement, as well as methods used to finance drug transactions and launder drug proceeds.

3.      I have personally participated in this investigation since July 2005, and reviewed reports of other law enforcement officers. Therefore, I am familiar with this drug trafficking conspiracy. As this Affidavit is submitted for the limited purpose of securing search warrants for various properties identified below, I have not included every fact known to me regarding this investigation.

4.      This affidavit is in support of an application for the issuance of search warrants authorizing the search of the following premises:



a)      ▮▮▮▮▮▮▮▮▮▮▮ Dover, Delaware
b)      ▮▮▮▮▮▮▮▮▮ , Dover, Delaware
c)      ▮▮▮▮▮▮▮▮▮ Dover, Delaware
d)      ▮▮▮▮▮▮▮▮ Felton, Delaware
e)      ▮▮▮▮▮▮▮▮ , Houston, Delaware
f)      ▮▮▮▮▮▮▮ Dover, Delaware

5.      As is described below, this investigation has revealed that Dover cocaine trafficker Willie Brown and his organization own, control, have access to, and utilize the premises listed above to facilitate the distribution of cocaine, and the manufacture and distribution of crack cocaine.

6.      During the course of my law enforcement career, I have had experience in debriefing defendants, witnesses, confidential sources and other persons having personal knowledge and experience regarding the amassing, spending, conversion, transportation, distribution and concealment of records and proceeds of trafficking in controlled substances. Based upon my training and experience and my participation in numerous other drug investigations relating to controlled substance violations, I know the following:

a)      That it is common for individuals involved in drug trafficking activities to maintain multiple premises from which their illegal business is conducted. These same individuals also store drugs, drug proceeds and records relating to the illegal trafficking of drugs at their residences, storage facilities, safe deposit boxes and/or businesses, as well as at the residences, storage facilities, safe deposit boxes and/or businesses of their relatives and co-conspirators;

b)      That persons involved in illegal drug trafficking frequently maintain, on hand, large amounts of U.S. Currency in order to finance their ongoing illegal activity;

c)      That individuals involved in drug trafficking often maintain books, records, receipts, notes, ledgers, airline tickets, money orders, passports and other papers relating to the transportation, importation, ordering, sale and distribution of controlled substances, and the laundering of the resulting drug proceeds. That drug traffickers commonly "front" controlled substances on consignment to their clients and keep written records of those transactions. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the drug traffickers have ready access to them and are often retained for several years;

d)      That it is common for large-scale drug traffickers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations for ready access and to conceal them from law enforcement authorities;

e)      That persons involved in large-scale drug trafficking activities often conceal within their residences, storage facilities, safe deposit boxes and/or businesses, caches of drugs, firearms, financial instruments, precious metals, jewelry, automobile titles, real property and deeds, and other items of value and/or proceeds of drug sales and evidence relating to the secreting or spending of large sums of money derived from drug trafficking;

f)      That drug traffickers commonly retain records of their financial transactions, including money order receipts, cashier's checks, titles, deeds, automobile titles and registrations, hotel and airline receipts and wire transfer receipts. These records are often stored on computer media or on media capable of being read by computers. These records are often retained for several years;

h)      That individuals involved in drug trafficking activities commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses and/or telephone numbers of their suppliers, customers and criminal associates in drug trafficking, and often possess photographs of other co-conspirators. These records are often retained for several years;

i)      That individuals involved in drug trafficking commonly use electronic equipment to aid them in their drug trafficking activities. This equipment includes, but is not limited to, mobile telephones, digital display pagers, speed dialers, electronic telephone/date books, computers, computer memory disks, scales, money counters, electronic surveillance equipment, eavesdropping equipment, police radio scanners and portable communication devices.

BACKGROUND

7.      Since September 2004, the DEA, Dover Police Department (DPD) and the Delaware State Police (DSP) have been investigating a cocaine distribution cell operating in Dover, Delaware, managed by Willie Brown. Specifically, DEA is investigating violations of:

(A) distribution and possession with intent to distribute cocaine and crack cocaine, Schedule II controlled substances, in violation of Title 21, United States Code, Section 841(a)(1);

(B) the unlawful use of communication facilities in committing or facilitating the commission of a Title 21, United States Code, felony offense, in violation of Title 21, United States Code, Section 843(b);

(C) conspiracy to distribute and possession with intent to distribute cocaine and cocaine base, Schedule II controlled substances, in violation of Title 21, United States Code, Sections 846 and 841(a)(1); and

(D) maintaining a drug-involved premises, in violation of Title 21, United States Code, Section 856.

8.      Some of the information I rely on in this affidavit was obtained from two confidential sources, CS-1 and CS-2. These sources are past, proven reliable, as I explain below.

9.      CS-1, has provided information to law enforcement since approximately July 2005. The information provided by CS-1 has been reliable and corroborated through physical surveillance and subsequent investigation by your Affiant and others. CS-1 has known Brown for several years and knows Brown to distribute approximately five kilograms of cocaine per month. CS-1 first told the DEA in the fall of 2005 that Brown travels to New York to acquire cocaine from "Dominican" source(s) of supply. CS-1 also told the DEA that Brown pays others to register vehicles in their name to avoid detection by law enforcement. During the course of this investigation, I was able to corroborate this information. For example, I know from my own observation that Brown uses a 1999 Honda Accord in connection with his drug trafficking, and that the car is registered in the name of someone else, specifically, ▮▮▮▮▮▮. In late April 2006, CS-1 stated that Brown continues to distribute cocaine.

10.     CS-2 has provided information to law enforcement for approximately one year. The information provided by CS-2 has been reliable and corroborated through physical surveillance and subsequent investigation by your Affiant and others. CS-2 told the DEA that Brown distributes cocaine and crack cocaine in Dover. Brown uses several co-conspirators to distribute cocaine, specifically ▮▮▮▮▮▮▮ I know from my own observation that ▮▮▮▮▮▮ brokered a two ounce (approximately 50 grams) crack cocaine transaction between Brown and an undercover agent (described in more detail below). Further, on April 23, 2006, CS-2 stated that ▮▮▮▮▮▮ stores between 50 grams and 500 grams of cocaine or crack cocaine at her residence located at ▮▮▮▮▮▮▮▮▮ Dover, Delaware.

11.     In addition to these sources, I rely in part on information obtained from two wiretaps authorized by the Honorable Sue L. Robinson on phones used by Willie Brown.[1]

12.     Information about the subjects pertinent to this affidavit are listed below:

(A) WILLIE BROWN. Based on information from CS-1 and CS-2, an undercover agent, hereinafter referred to UC-1 the wiretaps, surveillance and other sources, I know that Brown distributes cocaine and crack cocaine to individuals in the Dover, Delaware, area. Further, Brown manages several cocaine couriers in the Dover area. As will be discussed in detail below, Brown lists his address as ██████████████████ Dover Delaware, but actually resides at ██████████████████ As detailed below, my investigation has determined that Brown uses both apartments as a stash house for currency.

(B) ████████████ (hereinafter referred to as ████████, who, on December 7, 2005, delivered a quantity of cocaine to UC-1 for Brown.

(C) ██████████, (hereinafter referred to as ████████). On December 7, 2005, ██████ delivered a quantity of cocaine to UC-1 for Brown.

(D) ████████████████, resides at ████████████████ My investigation has determined that ████████ operates a stash house for Brown, as detailed below.

(E) ██████████████, resides at ██████████, Felton, Delaware. My investigation has determined that ████████ operates a stash house for Brown, as detailed below.

13.     In the paragraphs below, I detail the probable cause to search the subject premises. I have organized the information by property where possible, although some of the criminal activity described involved more than one property in a single episode.

████████████████████, **Dover Delaware**

14.     ████████████████████ is an apartment located inside building ██ of the ████████████████████ in Dover, Delaware. A photograph of ██████████████ ████████ is attached hereto as Exhibit A. On or about April 20, 2006, a law enforcement officer went into ██████████ and confirmed that ██████████ is clearly marked with ████ on the door.

15.     On February 24, 2006, law enforcement intercepted a call between Brown using ████████ and a female named ██████████████ Brown asked to speak to ████████ I know from a review of a Department of Housing and Urban Development tenant list that ████████████

---

[1] Not all portions of the consensual recorded and unrecorded calls are described herein. To the extent that quotations are used in the descriptions below, the quoted segments are based on summaries of consensual recorded and unrecorded telephone calls and not final transcripts. All dates and times are approximate.

█████████ is the tenant of █████████ Dover, Delaware. Brown told ██████ that "If I pay that bill, I'm running the house." He also said "listen, I'm running the house. When are you going to have that bitch up out of there? . . . you have 48 hours." Brown also said "I'll pay the whole $240 (referring to the rent), everybody got to go. Nobody allowed in unless I say so." I believe from this conversation that Brown was telling █████████ that if he pays the rent for █████████, then he controls who lives there, and who can come and go, and that █████████ agreed to this arrangement. In my training and experience, I know that drug traffickers will attempt to isolate key assets from the view of persons outside the conspiracy to keep knowledge of their activities as secret as possible.

16. Following this conversation, law enforcement observed on various days drug transactions taking place at █████████ For example, on March 1, 2006, law enforcement set up surveillance at █████████ During surveillance, TFO Jason Pires observed a group of people, including Brown, and persons identified as █████████ and █████████ standing in front of █████████ An unknown female approached this group about 5:00 p.m. and waved some money around. The female and █████████ then walked over to a bush in front of █████████ and conducted what TFO Pires believed to be, from his training and seven years of experience in drug investigations, a hand to hand drug transaction. About 5:18 p.m., Brown, █████████ and █████████ entered █████████ Four minutes later, the three men exited the house together. █████████ walked off to an alley nearby, while Brown stayed in front of █████████. Two minutes later, a male identified as █████████ approached Brown. Brown appeared to direct █████████ towards █████████ location. █████████ walked away, and a few minutes later, returned to Brown at █████████ and Brown then engaged in what appeared to be a hand to hand drug transaction behind a bush located in front of █████████. Also on March 1, 2006, at 6:54 p.m., law enforcement intercepted a call from █████████ to Brown at █████████ During the call, an unknown male told Brown he needed "3." Brown responded "OK" and said he was at █████████" I believe that "3" likely referred to three ounces of cocaine or crack cocaine.

17. On March 8, 2006, law enforcement set up surveillance at █████████ TFO Jason Pires observed activity consistent with drug trafficking as described above. For example, TFO Pires observed Brown standing outside for a lengthy period of time. Numerous individuals approached Brown during this time. TFO Pires observed what appeared to him to be at least one hand to hand drug transaction by Brown.

18. On March 8, 2006, at about 4:10 p.m., law enforcement observed Brown engage in conversation with █████████ Brown gave █████████ a set of keys. █████████ then got into a

_____

[2]On December 7, 2005 at about 4:35 p.m., UC-1 arranged to purchase crack cocaine from Brown. Physical surveillance units observed █████████ and █████████ arrive at the meet location and deliver approximately four ounces of crack cocaine to UC-1. UC-1 asked if the drugs were from Brown, and both █████████ and █████████ confirmed that this was correct. Minutes later, UC-1 placed a consensually-recorded call to Brown say "that stuff was on time" (confirming the accuracy of the weight of the cocaine). Brown replied affirmatively. UC-1 then told Brown that in the future he sought to purchase "a half" (referring to a half-kilogram of

1997 Chevy Tahoe, ███████ registered to Willie Brown, and traveled to ██████████ ██████ was observed parking in front of ███████ He was then observed entering ██████

19.     Four minutes later, ██████ xited ███████ got back in Brown's Tahoe and drove back to ██████████ Because of the agents' location, they were not able to observe what, if anything, ██████ was carrying when he left ███████. However, when ██████ exited Brown's Tahoe at ██████████ he was carrying a black back pack, partially concealed under his coat. Based on the way ██████ carried the bag, it appeared to be heavy. ████████ brought the black backpack into ██████████ Three minutes later, ██████ exited ████████████ carrying the black backpack. He no longer made an effort to conceal the bag under his coat, and it appeared to law enforcement to be empty. Based on my training and experience, I believe that ████████ cting as a courier for Brown, was sent by Brown to ████████████████ to retrieve cocaine stored there, and bring it to ███████

20.     On March 25, 2006, Brown called ████████████ at 5:20 p.m.. This phone is a cell phone subscribed to by ████████████████████████ However, ██████ ████████████ own a 2000 Dodge Neon, ██████████ The registered address for their car is ████████████████ On that call, Brown told a female "grab 84 by the floor right by the dishwasher." I believe that "84" refers to 84 grams, or 3 ounces of cocaine or crack cocaine. Within minutes, a female identified as ████████████ was seen exiting ████████████ carrying an object.

21.     ████████ was then observed getting in to an orange 2000 Dodge Neon. ████████ drove to a parking lot at the corner of Loockerman and Queen streets in Dover. After arriving, ████████ called Brown and said that she was "at the daycare." At 5:58 p.m., Brown arrived at the same parking lot. ████████ got out of her car and got into Brown's car, then returned to her car and left the area. Brown then got out of his car and walked towards an area barber shop.

22.     On April 1, 2006, a landline phone, ████████████ subscribed to by ██████████ ████████████ was used to call Brown. This call was intercepted. Brown spoke briefly to a female, then asked to speak to ████████ Brown told her "go right there next to the dishwasher, you know the little spot I've been using." ████████ asked, "the floor?" Brown replied "yeah, and get me 84." ████████ confirmed "84?" to which Brown responded "yeah."

23.     Based upon this investigation and my training and experience, I believe that there is a concealed location in this apartment, and that a search of ████████████ will result in evidence pertaining to the criminal involvement of Willie Brown, ████████████ and others, in violation of 21 U.S.C. §§ 841, 843, 846, and 856, specifically, the concealed location, which I would like to identify, inspect, and document by photographic and videographic means.

████████████████████████

24.     A photograph of ████████████████ Delaware is attached hereto as
_____

cocaine). Thus, I know that ████████████ work as couriers and distributors for Brown.

Exhibit B.

25.    On April 4, 2006, Brown and a female traveled to Wilmington. Acting on information that Brown was traveling to Wilmington to purchase cocaine from a source of supply, I arranged for the Delaware State Police to effect a traffic stop. DSP was able to stop the car Brown traveled in for speeding. After obtaining consent to search the car, DSP located and seized over $56,000 in U.S. currency. Following this stop, Brown called ███████████ This phone is subscribed to by ████████████████████████. Willie Brown described the traffic stop to the female who answered the phone, and then referring to other drug proceeds, the female stated, "it's already taken care of" which I believe means that she had removed the currency from inside the residence and concealed it elsewhere. Brown then described more money stashed at his mother's house. The female stated that she was going to "go and take care of it." In addition, in the fall of 2005, CS-1 had previously told law enforcement that Brown hides money at his mother's house.

26.    Willie Brown is currently on probation with the State of Delaware. I know from talking to Delaware Probation and Parole officers that ███████████is Willie Brown's mother and that she resides at ███████████████████ Dover, Delaware. In addition, Brown's driver's license lists ███████████████ as Brown's address. Also, Brown has told the Delaware Department of Probation and Parole that his address is ██████████████ Your affiant believes, based on the above-described incident and the information from CS-1, that Brown uses his mother's house as a location to store the proceeds of drug trafficking. Based upon this investigation and also my training and experience as described in paragraph 6, I believe that a search of ████████████will result in the seizure of documents and other evidence pertaining to the criminal involvement of Willie Brown and others in violations of 21 U.S.C. §§ 841, 843, 846 and 856, specifically,

a)    Books, records, receipts, notes, ledgers, and other papers relating to the transportation, ordering, purchase and distribution of controlled substances, in particular cocaine and crack cocaine.

b)    Books, records, invoices, receipts, bank statements and related records, passbooks, money drafts, money orders, bank drafts, cashiers checks, bank checks, safe deposit box keys and related records, money wrappers, and other items evidencing the obtaining secreting, transfer, and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money.

c)    United States currency (in excess of $1000.00), and jewelry, in amounts indicative of the proceeds of illegal drug trafficking.

d)    Photographs, including still photos, video tapes, films, and the contents therein, slides, in particular photographs of co conspirators, of assets and/or controlled substances.

e)    Address and/or telephone books, and any papers reflecting names, addresses, telephone numbers, pager numbers, and fax numbers of co conspirators, sources of supply, and

customers.

    f)       Firearms and ammunition.

27.    A photograph of ███████████████████████ Delaware is attached hereto as Exhibit C.

28.    On April 5, 2006, State Probation and Parole officers went to ███████████████ discuss Willie Brown's April 4 traffic stop with him. The officers spoke to ██████████, Willie Brown's mother, who indicated that Willie Brown lived with his sister ████████████████ ████████ As discussed above, Brown indicated to State Probation and Parole, and in public documents such as his driver's license that he lives at ████████████ue, and not ████████ ██████████████ As a probationer, Brown's residence is subject to unannounced searches by State Probation and Parole. Thus, Brown's listing of ██████████████ as his address, and his failure to notify authorities of his change in address, appear to be an effort by Brown to conceal his second residence from law enforcement. In my training and experience, I know that drug traffickers conceal currency and records of their activities at their residence. Brown's significant drug dealing activities, and his effort to conceal his residence, cause me to believe that evidence of his criminal activity will be found at ██████████████e. Thus, based upon this investigation and my training and experience as detailed in paragraph 6, I believe that a search of ███████████████will result in the seizure of documents and other evidence pertaining to the criminal involvement of Willie Brown and others in violations of 21 U.S.C. §§ 841, 843, 846 and 856, specifically,

    a)      Books, records, receipts, notes, ledgers, and other papers relating to the transportation, ordering, purchase and distribution of controlled substances, in particular cocaine and crack cocaine.

    b)      Books, records, invoices, receipts, bank statements and related records, passbooks, money drafts, money orders, bank drafts, cashiers checks, bank checks, safe deposit box keys and related records, money wrappers, and other items evidencing the obtaining secreting, transfer, and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money.

    c)      United States currency (in excess of $1000.00), and jewelry, in amounts indicative of the proceeds of illegal drug trafficking.

    d)      Photographs, including still photos, video tapes, films, and the contents therein, slides, in particular photographs of co conspirators, of assets and/or controlled substances.

    e)      Address and/or telephone books, and any papers reflecting names, addresses, telephone numbers, pager numbers, and fax numbers of co conspirators, sources of supply, and customers.

f)    Firearms and ammunition.

████████████████ ██Felton, Delaware

29.    A photograph of ████████████ ██lton, Delaware is attached hereto as Exhibit D.

30.    On March 3, 2006 telephone number ██████████ called Brown at ██████████ .
Telephone number ████████ is subscribed to by ████████████████
████████████ Based on this information and subsequent surveillance described below,
a conversation occurred between Brown and ████████ During the conversation, █████████asked,
"I was going to ask you if I could earn something so I can start making money." Brown replied
affirmatively. Later in the conversation, ████████asked, "cause I definitely got some fire on the
hole. But I wanted to check with you first." Again, Brown replied affirmatively. Based on my
training and experience, I believe that████████ffered to store drugs and/or drug proceeds for
Brown at her residence a████████████████Felton if Brown will pay her. This pattern is
consistent with the pattern described above concerning████████ at ████████████ and ████████
at████████████████

31.    On March 28, 2006, at approximately 3:50 p.m., a telephone call was intercepted between
Brown and ████████████ In summary, ████████ told Brown that she had "two" thousand
dollars and wanted to purchase cocaine. Brown then told████████that he would meet her in
one hour. I believe that████████wanted to purchase two and a half ounces of cocaine, which I
know would cost approximately $2,000 in the city of Dover, Delaware. Approximately nine (9)
minutes later, Brown made an outgoing call to████████at████████ During the
conversation, Brown told████████that he would be at her residence in five minutes. At
approximately 4:04 p.m., a call was intercepted between Brown and an unknown male. During
the conversation, the unknown male asked Brown to supply "two" ounces of cocaine on credit.
Brown agreed and told the unknown male that he would meet him between 5:00 p.m. and 6:00
p.m. At approximately 5:40 p.m., law enforcement observed Brown depart the Capitol Green
area of Dover operating the same silver Dodge Magnum described above. Surveillance units
followed Brown to████████████Felton, where he arrived at approximately 6:00 p.m.
At approximately 6:17 p.m., a call was intercepted between Brown and the unknown male who
ordered "two" ounces of cocaine. During the conversation, Brown told the unknown male to
meet him in twenty five minutes "where we normally meet." Approximately seven (7) minutes
later, law enforcement observed Brown traveling north in the silver Dodge Magnum on US-13
away from the area of████████████████ At approximately 6:41 p.m., law enforcement
observed Brown return to the Capitol Green area of Dover and park the Magnum in front of████
████████I know from this investigation that Capitol Green, specifically████████, is an
area where Brown distributes cocaine. I believe that after taking cocaine orders from two
customers, Brown traveled to one of his cocaine storage locations (████████████████
Felton), retrieved the cocaine and then delivered it to his customers.

32.    During the first week of April 2006, pursuant to the ongoing Title III wire intercept of
Brown, a series of telephone calls were intercepted where Brown was heard making
arrangements with a cocaine source of supply in Wilmington, Delaware to purchase

multi-kilograms of cocaine. Specifically, on April 1, 2006, Brown telephoned the cocaine source of supply and ordered, "two, ah, three... matter of fact, three no less than two." The cocaine source of supply replied, "alright." I believe that during this conversation, Brown was ordering between two and three kilograms of cocaine.

33. On April 3, 2006 three telephone calls were intercepted between Brown and███████ In summary, Brown was directing██████to travel with him to Wilmington, Delaware to purchase the two to three kilograms of cocaine discussed above. During the calls Brown also instructed██████ on where and at what time to meet him and when they were going to depart Dover for Wilmington.

34. On April 4, 2006 (the date of the $56,000 money seizure), another call was intercepted between Brown and██████ In summary, Brown told██████that he had already left Dover for Wilmington with another drug/money courier. ██████ then asked Brown when he would be making another trip to Wilmington; Brown responded, "again this weekend." Brown then told██████that he would be coming to her residence "tomorrow morning." Based on the conversations and the investigation, I believe that Brown intended to store the 2 to 3 kilograms of cocaine that he planned to purchase at██████ residence. I also believe that Brown trusts ██████to store bulk quantity of cocaine for him. It is common for drug traffickers to store other evidence (books, records, receipts, notes, ledgers, airline tickets, money orders, passports and other papers relating to the transportation, importation, ordering, sale and distribution of controlled substances, and the laundering of the resulting drug proceeds) of their drug trafficking organization at residences where trusted members of their organization reside, as I described in paragraph 6. I also know that it is common for the evidence to be retained for several years.

35. Thus, based upon this investigation and my training and experience, I believe that a search of ██████Felton, Delaware will result in the seizure of documents and other evidence pertaining to the criminal involvement of Willie Brown,██████ and others in violations of 21 U.S.C. §§ 841, 843, 846 and 856, specifically,

    a)    Books, records, receipts, notes, ledgers, and other papers relating to the transportation, ordering, purchase and distribution of controlled substances, in particular cocaine and crack cocaine.

    b)    Books, records, invoices, receipts, bank statements and related records, passbooks, money drafts, money orders, bank drafts, cashiers checks, bank checks, safe deposit box keys and related records, money wrappers, and other items evidencing the obtaining secreting, transfer, and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money.

    c)    United States currency (in excess of $1000.00), and jewelry, in amounts indicative of the proceeds of illegal drug trafficking.

    d)    Photographs, including still photos, video tapes, films, and the contents therein, slides, in particular photographs of co conspirators, of assets and/or controlled substances.

e)    Address and/or telephone books, and any papers reflecting names, addresses, telephone numbers, pager numbers, and fax numbers of co conspirators, sources of supply, and customers.

f)    Firearms and ammunition.

 Houston, Delaware

36.    A photograph of ███████████████████, Houston, Delaware is attached hereto as Exhibit E.

37.    On March 27, 2006, at approximately 3:19 p.m., cellular telephone number ████████ called Brown at ████████. Telephone number ████████ is subscribed to by ████████ ███████████████████ Houston, Delaware. A conversation occurred between Brown and an unknown male. During the conversation, Brown asked, "what you trying to do, though?" The unknown male answered, "the whole seven." Brown replied, "alright, I'll be there." I believe that in this conversation, the unknown male ordered, "seven" ounces (approximately 198 grams) of cocaine and Brown agreed to deliver it to the unknown male.

38.    At approximately 5:45 p.m., law enforcement observed Brown operating the same silver Dodge Magnum described above traveling south on US-13.   Law enforcement also noticed that ████████ who I believe runs a stash house at ███████████████ s described above, operating an orange 2000 Dodge Neon and traveling in tandem behind Brown's Magnum. Surveillance units followed the Magnum and the Neon to ███████████████ Houston, where both vehicles entered the driveway of the residence. Subsequently, Brown exited the Magnum and walked to the front passenger door of the Neon where he crouched down and reached into the vehicle. Within minutes, law enforcement observed ████████ depart the residence operating the Neon, while the Magnum remained a ███████████████ Based on the intercepted calls and the observations of law enforcement, I believe that the unknown male ordered "seven" ounces of cocaine, which Brown agreed to deliver to the customer. Brown then retrieved the cocaine and placed it into ████████ Neon. (This is a common occurrence for drug traffickers, so that in the event of a vehicle stop by law enforcement, the drug trafficker does not have possession of the drugs, but is in fact concealed in the drug courier's vehicle.) Brown and ████████ hen traveled separately to the customer's residence, where Brown retrieved the cocaine from the Neon and delivered it to the unknown male.

39.    On April 1, 2006, telephone number ████████ called Brown at ████████ A conversation occurred between Brown and the same unknown male described above. During the conversation, the unknown male asked, "is everything good for tomorrow?" Brown replied affirmatively. The unknown male then asked, "you going to get those (unintelligible)?" Brown replied affirmatively, "...bright and early tomorrow...and when I call I'll just bring them down." I know that during this time Brown was negotiating with a cocaine source of supply in Wilmington, Delaware to purchase multiple kilograms of cocaine as discussed above. Further, I believe that a portion of the cocaine was destined for the unknown male calling from the phone

registered to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ , Houston, Delaware. Thus, based upon this investigation and my training and experience, I believe that a search of▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓ Houston, Delaware will result in the seizure of documents and other evidence pertaining to the criminal involvement of Willie Brown and others in violations of 21 U.S.C. §§ 841, 843, 846 and 856. I believe a search of▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ will lead to evidence identifying the unknown male who ordered and received drugs from Willie Brown, specifically,

      a)     Books, records, invoices, receipts, bank statements and related records, passbooks, money drafts, money orders, bank drafts, cashiers checks, bank checks and other items evidencing the residence of a male at ▓▓▓▓▓▓▓▓▓▓▓▓▓ Houston, Delaware.

      b)     Photographs, including still photos, video tapes, films, and the contents therein, slides, in particular photographs indicating the residence of a male at▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓ Houston, Delaware.

      c)     Clothing and personal effects indicating the residence of a male at▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓ Houston, Delaware.

40.    I know that telephone▓▓▓▓▓▓▓▓▓ is a land line phone subscribed to by Leslie Ingram at▓▓▓▓▓▓▓▓▓▓▓▓▓ Dover Delaware. A photograph of this residence is attached hereto as Exhibit F.

41.    On February 27, 2006, law enforcement intercepted a call between Brown and▓▓▓▓▓▓ ▓▓▓ Brown told an unknown female to go inside of her room where the towels are and get out $100 and give it to ▓▓▓▓ Brown told the unknown female to have▓▓▓▓ pay for the room and then take her where she needs to go. Based on my training and experience, and knowledge of Brown's operation gained from my investigation, I believe that Brown was asking the female to give money to ▓▓▓▓▓▓▓ a known member of Brown's organization, to pay for a hotel room for Brown. I know from my training and experience that drug dealers will often use subordinates to obtain services, such as hotel rooms, in the name of a nominee to conceal the drug dealer's use of the room.

42.    On March 2, 2006, an unknown male called Brown from▓▓▓▓▓▓▓ and asked Brown, "do you want me to come get it or will you bring it to me?" Brown then told the unknown male that he (Brown) would call him back. I believe that during this call Brown and the unknown male were negotiating for the delivery▓▓▓▓▓▓▓▓▓▓▓▓▓ or pick up (by the unknown male calling from that same address) of cocaine or crack cocaine ("it").

43.    On March 4, 2006, an unknown female called Brown from▓▓▓▓▓▓▓ The female seemed to be upset with Brown because she had been waiting for 2 ½ to 3 hours for him. Brown then told her that he had a deal set up for her so that she could get through the night. The female asked Brown what deal was that? Brown told the female to come get 7 for $120 real quick.

Brown asked the female if she was going to come over and get the 7 for $120 real quick to hold her over until the next day. The female replies that she was going to get it on her way in. I believe, based on my training and experience, and knowledge gained from this investigation, that 7 for $120 refers to 7 grams of cocaine or crack cocaine for $120.

44.     On March 29, 2006, an unknown male called Brown from ████████████nd advised that he needed a quarter (referring to a quarter ounce of cocaine). Brown stated that he was en route to that location to comply with the order.

45.     On March 31, 2006, an unknown male called Brown from████████████Brown told the unknown male that he is going to bring him one (referring to one ounce of cocaine).

46.     On April 2, 2006, an unknown male called Brown from ████████████nd asked Brown to bring him a little something. Brown advised the unknown male that there was nothing left. Brown advised that he would be over there.

47.     Interceptions of Brown's phones ended on April 5, 2006. On April 23, 2006, CS-2 told the DEA that Brown distributes cocaine and crack cocaine in Dover. CS-2 also said that Brown uses several co-conspirators to distribute cocaine, specifically ████████. I am able to corroborate this information because I know from my own observation and discussions with UC-1 that on November 30, 2006 ████████brokered a two ounce (approximately 50 grams) crack cocaine transaction between Brown and UC-1. Specifically, on November 30, 2005, UC1 met with████and a source of information where Ingram stated that she would take UC-1's money and would pick up "two" for UC-1. UC-1 understood this to mean two ounces of crack cocaine. UC-1 wanted to deal with Brown directly, however. Later,████ called and spoke to the source of information. The UC-1 understood that Brown would meet with him at a laundromat. Brown did in fact meet with UC-1 on that day and sold UC-1 about 55.6 net grams of cocaine base. Further, on April 23, 2006, CS-2 stated that████████stores between 50 grams and 500 grams of cocaine or crack cocaine at her residence located at ████████ ████████Dover, Delaware.

48.     Based upon this investigation and my training and experience, I believe that a search of ████████████will result in the seizure of documents and other evidence pertaining to the criminal involvement of Willie Brown and others in violations of 21 U.S.C. §§ 841, 843, 846 and 856, specifically,

        a)     Books, records, receipts, notes, ledgers, and other papers relating to the transportation, ordering, purchase and distribution of controlled substances, in particular cocaine and crack cocaine.

        b)     Books, records, invoices, receipts, bank statements and related records, passbooks, money drafts, money orders, bank drafts, cashiers checks, bank checks, safe deposit box keys and related records, money wrappers, and other items evidencing the obtaining secreting, transfer, and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money.

c)    United States currency (in excess of $1000.00), and jewelry, in amounts indicative of the proceeds of illegal drug trafficking.

d)    Photographs, including still photos, video tapes, films, and the contents therein, slides, in particular photographs of co conspirators, of assets and/or controlled substances.

e)    Address and/or telephone books, and any papers reflecting names, addresses, telephone numbers, pager numbers, and fax numbers of co conspirators, sources of supply, and customers.

f)    Firearms and ammunition.

Jeffrey Dunn,
Special Agent
Drug Enforcement Administration

Subscribed and sworn to this 26th day of April, 2006.

(Honorable Mary Pat Thynge
United States Magistrate Judge